MODIFIED OPINION
No. 94,366

STATE OF KANSAS, *Appellee*, v. BRELAND D. DAVIS, *Appellant*.
(158 P.3d 317)

Original opinion filed December 8, 2006. See 282 Kan. 666. Modified opinion filed March 23, 2007.

*Sarah Ellen Johnson*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Breland Davis appeals his conviction of first-degree premeditated murder, contending that the trial court committed reversible error by: (1) admitting hearsay evidence in violation of his confrontation rights; (2) refusing to give a cautionary instruction regarding accomplice testimony; (3) refusing to instruct the jury

that "mere presence" at a crime scene does not necessitate a finding of guilt; and (4) committing cumulative error that requires reversal of his conviction. Davis also claims that the trial court assessed BIDS fees without first making findings regarding his ability to pay or the financial burden the fees would impose. We affirm defendant's conviction and sentence but reverse and remand on the BIDS fees question for a hearing regarding defendant's ability to pay such fees.

The defendant, Breland D. Davis, and the victim, Maurice Williams, were friends and lived close to one another. However, a few days before the murder of Williams, the defendant became upset with Williams because Williams had not stepped in when one of their other friends was "jumped" at Davis' apartment.

John Dickerson was a cousin of the defendant, and according to all the evidence at trial he was involved in the murder of Williams. On the night of the murder, John Dickerson was at the house of Latasha Kines. She testified at trial over defendant's hearsay objection that while she was engaged in sexual intercourse with Dickerson, he received a call on his cell phone. She stated that Dickerson told her the call was from his cousin, the defendant, who she overheard saying on the phone that he "had this nigger in the house and he wanted to kill him." The objection related to the hearsay statement of Dickerson: "It is my cousin Breland." After this call, Dickerson left Kines' house and returned sometime later with defendant and others.

At Dickerson's request, Kines drove him and the others to Davis' house. The defendant followed in Dickerson's vehicle. Once they all arrived at defendant's house, Kines was told to stay in her car while the others went inside. After awhile, she left her car, went up to the house, and entered into the kitchen, where she saw blood on the kitchen floor. Dickerson again told Kines to wait in her car. The others later returned to the cars, and Kines was told to pop the trunk. She did so and felt a heavy load put in the trunk of the car. The defendant told Kines to drive to Grove Park. At the park, Kines again popped the trunk, then waited in the car as defendant and one other person carried something in a blanket; Dickerson waited outside the car. After leaving Grove Park, Kines was told to

stop at a dumpster, where she popped the trunk once again and stayed in the car.

Early the next morning, a man looking for aluminum scraps in a dumpster found a rug and some sheets that he thought he would salvage for his sister. When he returned home, he saw that there was blood on the rug and sheets, so he turned them over to the authorities. When the rug was shown on the evening news with a request for information, Williams' grandfather, with whom he lived, called and identified the rug as belonging to Davis. He also filed a missing person report for Williams.

A number of people testified at trial that Davis had bragged to others regarding Williams' murder. Davis' cousin, Lavelle Griffin, also testified that Davis had shown him the gun used to kill Williams, a .410 shotgun, and had explained that they put a potato over the gun to muffle the sound when Williams was shot. In addition, Griffin overheard that Williams' body was buried in Grove Park.

The victim's blood was found at the defendant's apartment and on Davis' shoelace. The victim's body was found at Grove Park, where Kines stated that Davis and the others had dumped it the night of the victim's murder. The blood on the rug and sheets found in the dumpster matched the victim's DNA.

1.   Admission of Hearsay Evidence in Violation of Confrontation Rights

The defendant claims that the admission over his hearsay objection of Latasha Kines' trial testimony that Dickerson told her, "It is my cousin, Breland," violated his rights of confrontation under the United States and Kansas Constitutions. His argument rests upon *State v. Bratt*, 250 Kan. 264, 270, 824 P.2d 983 (1992) (citing *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 [1990]; *Ohio v. Roberts*, 448 U.S. 56, 65-66, 65 L. Ed. 2d 597, 107 S. Ct. 2531 [1980]). More specifically, the defendant argues that there was no showing that the hearsay statement was sufficiently reliable, either because it was subject to a firmly rooted hearsay exception under Kansas law or that it had other particularized guarantees of trustworthiness.

The trial court admitted Kines' testimony under the hearsay exception in K.S.A. 60-460(d)(3), explaining:

"Under the grounds alleged under K.S.A. 60-460(d)(3), [i]f the declarant is unavailable, I find that Mr. Dickerson is unavailable, as a witness, by the declarant at a time when the matter had been recently perceived by the declarant. It was almost, again, based on the purported testimony I have heard, it is almost contemporaneous with the statement being made. Mr. Dickerson's statement of what Mr. Davis had said was almost contemporaneous with that statement. While the declarant's recollection was clear, I think that would be. And was made in good faith. I have no reason to find that it wasn't made in good faith, and, again, under the circumstances shown by the purported evidence, based on statements of the attorneys, I find no incentive to . . . falsify or distort. So under (d)(3), I would allow the statement of Ms. Kines."

The above findings echo the requirements of K.S.A. 60-460(d)(3):

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(d) *Contemporaneous statements and statements admissible on ground of necessity generally.* A statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

This court reviews a trial court's determination that hearsay is admissible under a statutory exception, such as K.S.A. 60-460(d)(3) here, for an abuse of discretion. " 'The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " *State v. White,* 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting *Koon v. United States,* 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]). However, Davis does not challenge the trial judge's determination that Dickerson's statement was admissible under K.S.A. 60-460(d)(3).

Instead, Davis contends that the admission of Dickerson's statement violated his constitutional right to confront witnesses against him. This court's confrontation analysis is undertaken without def-

erence to the trial court's interpretation of the law. *State v. Bailey*, 263 Kan. 685, 697, 952 P.2d 1289 (1998).

During the pendency of defendant's case before this court, the United States Supreme Court decided *Davis v. Washington*, 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006). There, the Court considered two consolidated cases—one from Washington, involving the admissibility of statements during a 911 call, and one from Indiana, involving the admissibility of statements made to police officers at a crime scene—to determine whether the statements in each case violated the respective defendants' rights under the Sixth Amendment's Confrontation Clause. Before undergoing an analysis of each of the statements, however, the Court explained that it "must decide . . . whether the Confrontation Clause applies only to testimonial hearsay." 547 U.S. at 823.

This issue was considered but tabled by the Court in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). In that case, the Court declined to "definitively" hold that "the Confrontation Clause [applies] only to testimonial statements, leaving the remainder to regulation by hearsay law." 541 U.S. at 61. Instead, *Crawford* stated that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 541 U.S. at 68.

In *Davis*, the Court clarified that nontestimonial hearsay does *not* implicate the Confrontation Clause *at all*. As the Court explained:

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 1777 (2004), we held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. See [*Crawford*, 541 U.S. at 51]. *It is the testimonial*

*character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."* (Emphasis added.) 126 S. Ct. at 2273.

After *Davis*, the test to determine whether the admission of a hearsay statement violates a defendant's rights under the Confrontation Clause turns on whether the statement is testimonial. If a statement is found to be testimonial, it must be excluded unless a court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68. If a statement is not testimonial, then it does not implicate the Confrontation Clause, and the only consideration before the court is whether it may be admitted under one of the statutory exceptions to Kansas hearsay law. See *Davis*, 126 S. Ct. at 2273-74. A trial court's determination of whether a statement is admissible under the Kansas hearsay statutes is reviewed by this court for an abuse of discretion, which includes a determination that the trial court's discretion was exercised in light of a correct understanding of the applicable law. *White*, 279 Kan. at 332; *Bailey*, 263 Kan. at 697.

This confrontation analysis substantially alters the analysis of statements under the Confrontation Clause in this court's previous decisions. See, *e.g., State v. Lackey*, 280 Kan. 190, 199, 120 P.3d 332 (2005), *cert. denied* 126 S. Ct. 1653 (2006); *State v. Meeks*, 277 Kan. 609, 613-14, 88 P.3d 789 (2004); *State v. Betts*, 272 Kan. 369, 382-84, 33 P.3d 575 (2001); *State v. McKinney*, 272 Kan. 331, 342-44, 33 P.3d 234 (2001); *State v. Deal*, 271 Kan. 483, 500-01, 23 P.3d 840 (2001); *Bailey*, 263 Kan. at 692-94; *Bratt*, 250 Kan. at 269-70. In particular, the *Davis* analysis is markedly different from the confrontation analysis in *Bratt*, on which the defendant relies in his brief, which employed the two-prong unavailability and reliability test set forth in *Ohio v. Roberts*, 448 U.S. 56, regardless of the testimonial character of the statement in question. To the extent that the analysis in previous decisions of this court differs from the Confrontation Clause analysis set forth in this opinion, these previous decisions are overruled.

The United States Supreme Court has not provided a "comprehensive definition" of what causes a statement to be "testimonial"

for purposes of the Confrontation Clause. See *Davis*, 547 U.S. 822; *Crawford*, 541 U.S. at 68; *Lackey*, 280 Kan. at 200-01. This court need not consider such a definition in this case, however, because Davis concedes that the hearsay statement by Dickerson to Kines was not testimonial. Because the hearsay statement was nontestimonial, the trial court's admission of that statement does not implicate Davis' rights under the Confrontation Clause of the United States or Kansas Constitution.

Davis' rights under the Confrontation Clause were not violated when the trial court admitted the hearsay statement by Dickerson to Kines. Furthermore, Davis does not contend that the trial court abused its discretion when it admitted the statement under K.S.A. 60-460(d)(3). Therefore, the trial court did not err when it allowed Kines to testify as to Dickerson's hearsay statement.

2. Refusal to Give an Accomplice Instruction

Davis claims the trial court committed reversible error when it refused to grant his request for a cautionary instruction on accomplice testimony regarding Kines' trial testimony. When considering the refusal of the trial court to give a specific instruction, the evidence is viewed in the light most favorable to the party requesting the instruction. *State v. Lutter*, 27 Kan. App. 2d 858, 860, 10 P.3d 16, *rev. denied* 270 Kan. 902 (2000).

"A trial court has discretion in giving instructions to the jury. On appeal, the instructions should be approved if, after being considered in their entirety, they properly and fairly state the law as applied to the facts. [Citation omitted.] . . . When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. [Citation omitted.]" *State v. Johnson*, 255 Kan. 252, 256-57, 874 P.2d 623 (1994).

The requested instruction, PIK Crim. 3d 52.18, pertains to accomplice witness testimony and specifically provides that it applies to witnesses who testify that they were "involved in the commission of the crime with which the defendant is charged." Thus, the threshold question is whether Kines can be considered an "accom-

plice" within the meaning of the instruction. The relevant case law suggests that she cannot.

This court has explained that, "[a]s to the accomplice instruction, PIK Crim. 3d 52.18 defines an accomplice as one who testifies that he or she was involved in the commission of the crime with which the defendant is charged." *State v. Abel,* 261 Kan. 331, 336, 932 P.2d 952 (1997), *disapproved in part on other grounds State v. Mathenia,* 262 Kan. 890, 898-99, 942 P.2d 624 (1997). In that case, the defendant Abel was charged with and convicted of felony murder, aggravated burglary, and aggravated robbery. On appeal, Abel asserted that the trial court should have provided the cautionary accomplice instruction regarding two of the State's witnesses. This court summarily rejected Abel's argument, finding that the contention that "an accomplice instruction was required fails as there was no testimony that either [witness] acted as [an accomplice] in the murder, aggravated burglary, or aggravated robbery charged." 261 Kan. at 336; see also *State v. Noriega,* 261 Kan. 440, 447, 932 P.2d 940 (1997), *disapproved in part on other grounds State v. Mathenia,* 262 Kan. 890, 898-99, 942 P.2d 624 (1997) ("Noriega's argument that an accomplice instruction was required fails as there was no testimony that either [witness] acted as [an accomplice] in the murder, aggravated burglary, or aggravated robbery charged.").

Similarly, in *State v. Humphery,* 267 Kan. 45, 47, 978 P.2d 264 (1999), the defendant was convicted of felony murder, aggravated burglary, and criminal possession of a firearm. At his trial, Simmons, a witness for the State, testified that she was present when the victim was killed and identified Humphery as the killer. Another witness, Kelsey, also testified that he was present and identified Humphery as the shooter. On appeal, the defendant argued that, while it was not requested, the court should have given an accomplice instruction with regard to these two witnesses' testimony. 267 Kan. at 62.

This court rejected the defendant's argument that an accomplice instruction was required, because the witnesses were not accomplices within the meaning of the instruction. 267 Kan. at 62-63. The *Humphery* court explained:

"Simmons does not fit the definition of an accomplice . . . . The entire basis of her testimony was that she had sex with [the victim] and directed him to drive to [the place where he was shot], but she was not involved in the robbery or the murder in any way. Some of the evidence presented at trial could sustain the inference that Simmons was involved in the crime, but she is not an accomplice as contemplated by the jury instruction on accomplices. . . . Further, it cannot be said that Simmons or Kelsey were accomplices under a conspiracy theory because there was no evidence of a conspiracy." 267 Kan. at 62-63.

In *State v. Gholston*, 272 Kan. 601, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 936 (2002), where Gholston was convicted of first-degree murder, this court again held that an accomplice instruction was not required where there was no evidence that the witness in question was an accomplice. At trial, the court admitted both live testimony and tape-recorded statements of Berger, who had at one time been "considered by the police as an accomplice in the shooting." 272 Kan. at 616. Apparently, at some time prior to trial, the detective on the case had threatened to prosecute Berger for the crime of accessory to murder if she did not cooperate. Berger later testified that she was with Gholston the night of the shooting and had gone with him and a group to the convenience store, and identified Gholston as the shooter.

Among other arguments, Gholston argued on appeal that the court should have given the cautionary instruction regarding accomplice testimony with reference to Berger's statements. This court reasoned that

"although [the detective] Hennessy told Berger that her actions on the night of the shooting could result in the charge of murder as an aider and abettor, there is no evidence that Berger had knowingly associated or participated in the crime. . . . In statements to Gholston's attorney, Berger stated that she never saw the gun in the car, she never saw Gholston get out of the car with a gun, and she never saw the gun until she saw Gholston shooting. In a taped interview with Hennessy, Berger stated that she did not know Gholston had a gun until the shooting started." 272 Kan. at 618.

In light of the lack of evidence that would link Berger as an accomplice, this court held that "the judge was not required to give an accomplice instruction." 272 Kan. at 618.

The record establishes that Kines was not "involved in the commission of the crime with which [Davis was] charged," and thus

was not an accomplice within the meaning of the requested instruction. There is no evidence that Kines was present at the time that the victim was murdered, nor was she involved in the planning of the murder. Davis argues that Dickerson may have made statements that Kines was present at the time of the killing, but these "statements" were only mentioned at trial in the form of a cross-examination question by Davis' counsel:

"Q. [Defense Counsel] . . . Did Detective Chisholm also tell you that John said you were present during the shooting?
"A. [Kines] Yes.
"Q. Was that true?
"A. No.

. . . .

"Q. So you weren't there when the shooting happened?
"A. No."

This implication by Davis' counsel offers no substantive evidence that Kines was present when the victim was killed. On the contrary, the only evidence at trial regarding Kines' whereabouts and involvement was offered by Kines herself; she testified that she was not present. Moreover, there was no evidence that she otherwise participated in the planning or commission of the murder, other than the events, described in her testimony, which occurred "after the fact."

Defendant argues that being a mere accessory after the fact is enough to warrant an accomplice instruction. Defendant relies upon *State v. Rakestraw*, 255 Kan. 35, 871 P.2d 1274 (1994), where this court reversed the defendant's conviction of second-degree murder because the trial court erred by admitting a redacted, out-of-court statement of the defendant, depriving him of a fair trial. 255 Kan. at 35, 46. In addition to its holding, this court also agreed that the trial court should have provided an accomplice instruction with regard to statements made by a witness named Harris. 255 Kan. at 46. The *Rakestraw* court explained in this regard:

"At trial, the defendant requested an accomplice instruction, but the trial judge denied the request on the basis that being charged as an accessory would not make Harris an accomplice. Only if Harris had been charged with the same crime would he have been an accomplice. While it is true that Harris was not charged with murder, Billingsley [a codefendant] at least implicated Harris in the beating.

Although Billingsley denied witnessing the beating, he placed Harris at the scene, and his defense counsel tried to cast doubt on Harris' claim that he was not involved in the fight and was spattered with blood only while trying to render aid to the victim. Upon remand, it would be appropriate for the trial court to grant the defendant's request and give the cautionary instruction on accomplice testimony. We need not and do not decide whether the failure to give such an instruction was reversible error. We do conclude that the question is close enough for us to advise the court to give a cautionary instruction on accomplice testimony if Harris testifies at the new trial." 255 Kan. at 46.

Davis argues that these statements in *Rakestraw* indicate that this court has "recognized the propriety of giving the cautionary instruction in cases where the witness' testimony would only render the witness an accessory after the fact, not an aider and abettor." Davis misconstrues *Rakestraw*, which explained that the accomplice instruction would be appropriate because there was *evidence and testimony at trial* that indicated that the witness was involved in the commission of the murder. Furthermore, this court did *not* state that a failure to provide the instruction, even when it was requested in such circumstances, was reversible error. Instead, the court counseled that an accomplice instruction would be "appropriate" in the new trial. See 255 Kan. at 46. Thus, *Rakestraw* provides no basis for Davis' argument here that Kines' participation in events after the murder would make her an accomplice within the meaning of the instruction.

According to Davis' brief, "[w]hether [Kines] actually admitted to being involved before the murder is irrelevant to the analysis. She was, by her own testimony, involved in the events of that evening." This court has specifically rejected the idea that mere "involvement in events" makes a witness an accomplice within the meaning of PIK Crim. 3d 52.18. See *Gholston*, 272 Kan. at 618. Instead, the witness must have been *involved in the commission of the crime with which the defendant is charged.* There is no evidence here to support Davis' claim that Kines was an accomplice within the meaning of PIK Crim. 3d 52.18. Thus, the accomplice instruction was neither required nor appropriate.

### 3. Refusal of a Mere Presence Instruction

Davis also asserts that this court should reverse due to the trial court's refusal to provide an instruction that mere presence at the crime scene is not evidence of guilt. While Davis did not submit jury instructions before trial, his counsel at trial requested that such an instruction be given. The court agreed that the proposed "mere presence" instruction was a correct statement of the law, but refused to give the instruction since it was already giving the aiding and abetting instruction under PIK Crim. 3d 54.05. However, the court did state that Davis' counsel could describe the law on "mere presence" in his closing argument, which he later did.

The aiding and abetting instruction provided by the trial court, stated:

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, [or] procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

See PIK Crim. 3d 54.05.

In general, when considering the refusal of the trial court to give a specific instruction, the evidence is viewed in the light most favorable to the party requesting the instruction. *State v. Lutter*, 27 Kan. App. 2d 858, 860, 10 P.3d 16, *rev. denied* 270 Kan. 902 (2000). In cases where a defendant objects to instructions, this court is required to consider the instructions as a whole and not isolate any one instruction. *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006). " ' "If the instructions properly and fairly state law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous." ' " *State v. Mays*, 277 Kan. 359, 378-79, 85 P.3d 1208 (2004) (quoting *State v. Peterson*, 273 Kan. 217, 221, 42 P.3d 137 [2002]).

Davis' proposed instruction is a correct statement of the law that "mere presence of an accused at the time and place of the crime alleged is not sufficient to make the accused guilty of a crime." *State v. Wakefield*, 267 Kan. 116, 121, 977 P.2d 941 (1999). While

an appellate court must usually view the evidence in the light most favorable to the defendant when a proposed instruction has been refused, this court has specifically stated that a "mere presence" instruction need not be included when the trial court provides the aiding and abetting instruction in PIK Crim. 3d 54.05. *State v. Hunter*, 241 Kan. 629, 638-39, 740 P.2d 559 (1987). In *Hunter*, this court explained that previous cases had held that "the PIK instruction given clearly informed the jury that intentional acts by a defendant must be proved to convict for aiding and abetting and, thus, proof of mere association or presence would be insufficient to convict. Therefore, the refusal to give defendant's requested instruction was not error." 241 Kan. at 639.

This court had the opportunity to reconsider the *Hunter* rule in *State v. Pink*, 270 Kan. 728, 738-39, 20 P.3d 31 (2001), in the context of a similar proposed instruction that "mere association" does not establish guilt as an aider or abettor. Instead of reversing Supreme Court precedent, the *Pink* court found that "[i]t is well established under Kansas cases that the concept of 'mere association' which is embodied in the instruction set forth above and the refusal of the trial court to give an additional instruction on mere association is not erroneous. [Citations omitted.]" 270 Kan. at 739. Thus, the court held that the trial court's refusal to give a "mere association" instruction was not error.

Davis acknowledges that our decision in *Hunter* states that the trial court was not required to give his proposed instruction, but nevertheless argues that this decision should be "reconsidered." According to Davis in his brief, "[s]ome jurors may be inclined to apply the idea of guilt by association," and "the jury should have as much information of and guidance on the law as possible" to prevent misunderstanding. Because the "mere presence" instruction would have been a correct statement of the law, Davis argues that "[t]here simply is no good reason for refusing to give the instruction."

We disagree and reject defendant's request to reexamine our holding in *Hunter*. The defendant's argument is based upon speculation that a jury might convict based upon defendant's mere presence. However, this court has stated that "[j]uries are presumed

to have followed the instructions given by the trial court. [Citation omitted.]" *State v. Tyler*, 251 Kan. 616, 638, 840 P.2d 413 (1992). In addition, this court has explained that "[e]rror cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused. [Citations omitted.]" *State v. Osbey*, 238 Kan. 280, 286, 710 P.2d 676 (1985). There is no evidence that any of the jurors actually misunderstood the requirement that the State must prove intentional acts to prove guilt. We conclude that the aiding and abetting instruction adequately encompassed the "mere presence" rule, and that it was not reversible error for the trial court to refuse to give the instruction in this case.

4. Cumulative Error

Davis next argues that, even if the events described in Issues I through III—the admission of Kines' testimony regarding John Dickerson's statement, "It is my cousin Breland," when he received a phone call; the trial court's refusal to give a cautionary instruction regarding accomplice testimony; and the trial court's refusal to give an instruction that "mere presence" does not amount to guilt— were not in and of themselves reversible error, the cumulative effect of these events denied Davis his right to a fair trial.

In *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 (2006), this court recently explained:

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]"

With the exception of the final assignment of error by the defendant, the record simply does not support all other errors raised, and therefore the record does not support a claim of cumulative error.

5. BIDS Fees Assessment and Ability to Pay

In his final issue raised on appeal, Davis asserts that the trial judge improperly assessed fees to be paid to the Board of Indigents'

Defense Services (BIDS), including $7,000 in attorney fees and $50 in administrative costs, without first considering the financial resources of Davis or the burden that the fees would impose.

At sentencing, the trial judge did not discuss the BIDS fees or attorney fees at any length, but simply assessed against Davis, among other court costs and compensation, "$7,000 as partial reimbursement to the State of Kansas for the cost of your court appointed attorney" and a "$50 fee to BIDS. That's the Board of Indigent [sic] Defense Services in Topeka . . . ." The judge did not explain the origins of these numbers, nor did he make any findings on the record regarding Davis' ability to pay the fees. Davis now argues that, because the trial court failed to make these findings, this court should reverse the judge's assessment of the BIDS fees against him. We agree.

This court recently resolved these issues in *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006). In that case, Robinson was convicted of felony possession of marijuana and misdemeanor possession of drug paraphernalia. In addition to his incarceration and probationary sentences, the sentencing court assessed BIDS attorney and administrative fees of $745 and $50, respectively. Robinson challenged the assessment of these fees on the ground that the sentencing judge failed "to explicitly consider [his] ability to pay and the financial burden payment would impose at the time of the assessment," and claimed a due process violation because the judge did not consider the validity of the fees. 281 Kan. at 539.

On appeal, this court rejected the due process claim but reversed the trial court's assessment of the BIDS fees on Robinson's first claim. 281 Kan. at 548. In particular, the court held that a trial court must consider a defendant's ability to pay and the hardship that a fee would impose *at the time payment is ordered*. 281 Kan. at 543. As the *Robinson* court explained:

"The language of K.S.A. 2005 Supp. 22-4513(b) clearly requires a sentencing judge, 'in determining the amount and method of payment' of BIDS reimbursement, *i.e.*, at the time the reimbursement is ordered, to 'take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose.' The language is mandatory; the legislature stated unequivocally that this 'shall' occur, in the same way that it stated unequivocally that

the BIDS fees 'shall' be taxed against the defendant. Compare K.S.A. 2005 Supp. 22-4513(a), (b). The language is in no way conditional. There is no indication that the defendant must first request that the sentencing court consider his or her financial circumstances or that the defendant must first object to the proposed BIDS fees to draw the sentencing court's attention to those circumstances." 281 Kan. at 543-44.

The *Robinson* court also rejected the State's waiver argument where the State argued, as it does here, that the waiver provision in K.S.A. 2005 Supp. 22-4513(b) indicates that an assessment of a defendant's ability to pay and the financial burden imposed by a fee should be assessed after a defendant has petitioned for waiver of an assessed BIDS fee. This court explicitly found this argument to be without merit. According to the court's reasoning, "the fact that the statute also permits a defendant to petition for waiver does not change the mandatory language or mean the waiver procedure is intended as a substitute for the sentencing court's initial consideration of a defendant's finances." 281 Kan. at 544.

The court concluded its discussion of Robinson's BIDS fees with three instructions regarding the proper application of its ruling:

"First, the sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating *on the record* how those factors have been weighed in the court's decision. Without an adequate record on these points, meaningful appellate review of whether the court abused its discretion in setting the amount and method of payment of the fees would be impossible. [Citation omitted.]

"Second, a sentencing court's failure to include such explicit consideration of the defendant's financial circumstances in the record *does not render the sentence associated with the resulting assessment 'illegal,'* as that term is used in K.S.A. 22-3504. As we have already said, the assessment itself is not punitive; it is not a punishment or part of the sentence at all. . . .

"Third, and finally, we . . . recognize that subsection (a) of K.S.A. 2005 Supp. 22-4513 states that taxation of 'all expenditures' by BIDS shall occur and that neither subsection (a) nor subsection (b) explicitly states consideration of a defendant's financial resources must occur 'at sentencing.' However, reading the subsections together, this is their practical effect. The consideration must occur, and sentencing is the proceeding that routinely addresses BIDS reimbursement." (Emphasis added.) 281 Kan. at 546-47.

In the instant case, the sentencing judge made no explicit, on-the-record finding at the original assessment of BIDS fees against

Davis regarding his ability to pay the fees or the financial burden the fees would impose. The statutory framework under which Davis' BIDS fees were imposed was identical to that discussed in *Robinson*. Thus, while the sentencing court's failure to make on-the-record findings regarding Davis' fees does not affect the legitimacy of Davis' conviction or sentence, it nevertheless is cause for reversing the court's BIDS assessment. We therefore reverse the BIDS assessment and remand for an assessment consistent with this court's opinion in *Robinson*.

The conviction of defendant is affirmed; the BIDS assessment is set aside, and the case is remanded for an assessment consistent with *Robinson*.